**UNITED STATES of America**

v.

**Denis RIVERA, Luis Alberto Cartagena, Noe David Ramirez–Guardado.**

No. CR.A. 02–376–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 17, 2003.

Michael Rich, Ronald Walutes, United States Attorney's Office, Alexandria, VA, for Plaintiffs.

Jerome P. Aquino, Alexandra, VA, Robert Lee Jenkins, Jr., Bynum & Jenkins PLLC, Alexandria, VA, John C. Kiyonaga, Kiyonaga And Klyonaga, Alexandria, VA, Mark S. Thrash, Sher & Cummings, Arlington, VA, Paul P. Vangellow, Falls Church, VA, Lana Marie Manitta, Martin, Arif, Petrovich & Walsh, Springfield, VA, for Defendants.

*MEMORANDUM OPINION*

ELLIS, District Judge.

At issue in this prosecution of three defendants for murder and conspiracy to murder, in violation of 18 U.S.C. §§ 2, 1111 and 1117, is whether tape recorded telephone calls made on prison telephones by one of the three defendants while in custody awaiting trial may be admitted into evidence by the government pursuant to two exceptions to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, the federal wiretapping statute, 18 U.S.C. §§ 2510–2520, namely (i) the law enforcement exception, 18 U.S.C. § 2510(5)(a)(ii), and (ii) the consent exception, 18 U.S.C. § 2511(2)(c).

## I.

Defendants Denis Rivera, Luis Alberto Cartagena, and Noe David Ramirez–Guardado were indicted and now face trial for the September 16, 2001 murder of Joaquin Diaz on United States Park Land in Alexandria, Virginia. For a more detailed statement of the facts underlying the alleged conspiracy to murder and the murder of Joaquin Diaz, see *United States v. Rivera et al.*, 292 F.Supp.2d 827 (E.D.Va. 2003) (granting motion pursuant to Rule 804(b)(6), Fed.R.Evid., to admit hearsay statements of a murdered witness). Only the facts pertinent to defendant Rivera's motion in limine to preclude admission of recorded telephone statements pursuant to Title III need be recounted here.

The government alleges that the three defendants were members of a violent Hispanic youth gang known as Mara Salvatrucha, or more commonly, "MS–13." As part of the gang, they conspired to murder Diaz and did so by stabbing him several times

in a wooded area on Daingerfield Island in Alexandria. As a consequence of his involvement in Diaz's murder, defendant Rivera has been in custody in the Arlington County and Fairfax County Detention Centers since June 2002 on both state and federal charges. He has been housed chiefly at the Arlington facility, but was transferred to the Fairfax facility for two short stays between May 20–23, 2003 and July 19–23, 2003.[1] For security purposes, both facilities routinely tape record all telephone conversations of every prisoner. The record reflects that neither facility singled out Rivera's calls for monitoring and recording. The sole exceptions to both facilities' routine recording practices of all telephone calls are prisoners' privileged conversations with their attorneys. All inmates, prior to beginning each call, must enter a personal identification number (PIN) assigned to them by the facility. Thus, many of Rivera's calls are identifiable because he used his correct PIN. In some instances, however, Rivera used the PIN of another inmate. Yet, the content of these conversations leaves no doubt that Rivera initiated the call.[2]

Although both facilities recorded calls for the same purpose, each facility employed somewhat different procedures in doing so. These procedures are briefly described.

### A. Arlington County Detention Center

The Arlington County Detention Center contracts with Verizon Virginia Inc. (Verizon), a private company, that in turn subcontracts with Global Tel*link, also a private company, for the recording of all inmate telephone calls made on the facility's telephone system.[3] The calls are recorded pursuant to the terms of the con-

1. Because Rivera has spent the great majority of his time at the Arlington facility, nearly all the calls the government seeks to admit were made from that facility.

2. *See Rivera et al.*, 292 F.Supp.2d at 837 n. 28 (overruling Rivera's authenticity objection

pursuant to Rule 901, Fed.R.Evid., to the telephone transcripts of Rivera's calls).

3. The facts regarding the Arlington County facility's procedures for recording telephone

tract at the direction of Arlington County and neither Verizon, Global Tel*link, nor any other private entity is authorized to record calls other than at the direction of the County. Additionally, once calls are recorded, only employees of the Arlington County Sheriff's office have access to the recordings or contents of the calls.

Inmates at the Arlington facility are notified that their calls are recorded and potentially monitored in two ways. First, a sign, entitled "Inmate Phone System," posted next to the phone bank alerts inmates that all calls may be recorded and/or monitored. Specifically, this sign states:

> Effective immediately, each phone call will require the use of your inmate number (P–XXXX) to gain access to the phone system. Please be advised that each phone call is subject to recording, monitoring and criminal, civil and/or administrative disciplinary action.

Second, after an inmate dials his PIN to access the telephone system, he hears a voice prompt informing him as follows: "This is Verizon. This call will be recorded and monitored." The prompt then alerts the recipient of the call that the call is coming collect from the named inmate at the Arlington facility and requires the recipient to dial "0" to accept the call. At any time during the voice prompt, the inmate may hang up, in which event, of course, no recording or monitoring will occur. Although inmates do not sign a form consenting to the recording or monitoring of their calls at any time during their incarceration, they signify their consent to the recording and monitoring of the calls by proceeding with the calls in the face of the notices.

### B. *Fairfax County Detention Center*

Unlike the Arlington facility, the Fairfax County Detention Center does not contract with a private entity to record inmate telephone calls.[4] Rather, all prisoner calls, except calls to or from attorneys, are recorded on equipment located inside the facility and monitored by deputies employed by the Sheriff's office. The facility contracts with a private entity only for use of the servers on which calls are recorded and stored, which occurs exclusively at the direction and authorization of the County.

The facility notifies the inmates that their calls are recorded and monitored in two ways. First, on arrival at the facility, each inmate is given a handbook, either in English or Spanish, that sets forth the facility's rules. In the section entitled "Telephone Use," the handbook alerts inmates that "the Sheriff's Office reserves the right to tape-record and/or monitor any inmate telephone call we deem necessary." Moreover, prior to each call, the inmate hears a voice prompt in English or Spanish that alerts the inmate that the call is being recorded and monitored. After hearing the voice prompt, the inmate may hang up to avoid the recording and monitoring of his call. The facility does not post a sign reflecting its recording policy near the phone bank, nor does it require the inmates to sign a form consenting to call recording or monitoring.

The government has disclosed over 175 telephone conversations initiated by Rivera from the Arlington and Fairfax County Detention Centers.[5] It intends to offer a

---

calls were derived from testimony by Michael Goodrich, a contract manager for the Arlington County Sheriff's office.

**4.** The facts regarding the Fairfax County facility's procedures for recording telephone calls were derived from the testimony of Deputy

Sheriff Dwight Grear, a Fairfax County Sheriff.

**5.** The telephone conversations are almost exclusively in Spanish and were interpreted and transcribed by Maria Horvath, a certified court-appointed interpreter. Ms. Horvath is thoroughly qualified with more than seven-

number of these calls into evidence at trial.[6] The defendant now moves to suppress these calls pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, the federal wiretapping statute, 18 U.S.C. § 2510–2520, arguing that Fairfax and Arlington Counties were not judicially authorized to intercept Rivera's calls.[7] In response, the government contends that the recorded calls come within two exceptions to Title III's prohibition against the unauthorized interception of "any wire, oral, or electronic communication:"[8] (1) the law enforcement exception, 18 U.S.C. § 2510(5)(a)(ii), and (2) the consent exception, 18 U.S.C. §§ 2511(2)(c). Thus, the question presented here is whether the government has shown that the facts fit one or both of these exceptions.

## II.

Title III prohibits the interception of "any wire, oral, or electronic communication," including telephone conversations, in the absence of judicial authorization. 18 U.S.C. §§ 2511(1), 2516; *see also United States v. Hammond*, 286 F.3d 189, 192 (4th Cir.2002); *United States v. Lanoue*, 71 F.3d 966, 980 (1st Cir.1995); *United States v. Horr*, 963 F.2d 1124, 1125–26 (8th Cir. 1992); *Willoughby*, 860 F.2d at 19. The statute provides that telephone communications intercepted in violation of Title III may not "be received in evidence in any trial...." 18 U.S.C. § 2515; *see also Lanoue*, 71 F.3d at 981; *Horr*, 963 F.2d at 1126. Although Congress did not specifically indicate that the statute applied in the prison context, courts have extended Title III's protections to conversations by inmates on prison telephones. *See Hammond*, 286 F.3d at 192 ("Although the argument has been made that Title III was not intended by Congress to apply to prisons, it is well accepted that its protections do apply in that context."); *United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir.1996) ("Title III applies to the prison system...."); *Lanoue*, 71 F.3d at 980 ("Title III's protections extend to prisoners' conversations over institutional telephones."); *United States v. Amen*, 831 F.2d 373, 378 (2d Cir.1987) ("Title III clearly applies to prison monitoring."); *United States v. Paul*, 614 F.2d 115, 116 n. 2 (6th Cir.1980) (applying Title III in the prison context). Despite the statute's broad prohibition, the government may intercept telephone communications without prior judicial authorization in two contexts: (i) when the conversation is intercepted "by an investigative law enforcement officer in the ordinary course of his duties," 18 U.S.C. § 2510(5)(a)(ii), and (ii) when "one of the parties to the communication has given prior consent to such interception," 18 U.S.C. § 2511(2)(c). *See Hammond*, 286 F.3d at 192; *Van Poyck*, 77 F.3d at

---

teen years of experience as a Spanish–English interpreter in federal courts in this and other districts. Her appointment in this case was agreed to by all parties.

6. The government does not seek to admit any calls made to an attorney. Thus, the evidence does not raise any issue regarding the attorney-client privilege.

7. *See* 18 U.S.C. § 2515 ("Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial....").

8. 18 U.S.C. § 2511(1)(a). The statute's prohibition with regard to "any wire, oral, or electronic communication" includes telephone communications. *See, e.g., United States v. Hammond*, 286 F.3d 189, 192 (4th Cir.2002) (applying Title III to taped inmate telephone conversations); *United States v. Willoughby*, 860 F.2d 15, 19 (2d Cir.1988) (same); *United States v. Rohlsen*, 968 F.Supp. 1049, 1050 (D.Vi.1997) ("The Act applies to the interception of telephone communications.").

291; *Lanoue,* 71 F.3d at 980–81; *United States v. Feekes,* 879 F.2d 1562, 1565 (7th Cir.1989). A review of the record in this case reveals that both the Arlington and Fairfax facilities' interceptions of Rivera's telephone conversations fall within both the law enforcement and consent exceptions to Title III's prohibition.

### A. Law Enforcement Exception

The statute and caselaw make clear that telephone communications intercepted by the government without judicial authorization will not be subject to the prohibitions of Title III if intercepted "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii); *see also Hammond,* 286 F.3d at 192; *Abraham v. County of Greenville,* 237 F.3d 386, 388 (4th Cir.2001). This exception fits both the Arlington and Fairfax facilities. In the Arlington County Detention Center, Rivera's calls were recorded as part of the facility's routine procedure to record all prisoner telephone calls. The Arlington facility accomplished this by contracting with Verizon and its subcontractor, Global Tel*link, which recorded calls under the direction of the County. In the Fairfax County Detention Center, Rivera's calls were similarly recorded as part of the facility's routine procedure to record all prisoner telephone calls. And, in the Fairfax facility, recording was performed by Deputy Sheriffs employed by the County to perform intelligence work within the facility.

Rivera does not argue, and for good reason, that the recording of his calls was performed out of the ordinary course of duties of the Verizon, Global Tel*link, or prison personnel. The caselaw makes clear that the recording or intercepting of telephone communications in a prison is performed in the ordinary course of duties of prison personnel provided it is part of a prison's routine procedure designed to safeguard security in the institution, and is not part of a criminal investigation of a single inmate.[9] In this instance, both the Arlington and Fairfax facilities routinely recorded inmate phone calls for safety and security purposes and not as part of any criminal investigation of Rivera.

■ Nonetheless, Rivera contends that the law enforcement exception does not apply to calls made from the Arlington facility because these calls were recorded by Verizon and Global Tel*link, private entities, and not an investigative or law enforcement officer, as Title III requires. In this regard, the statute defines an "investigative or law enforcement officer" as:

> any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses.

18 U.S.C. § 2510(7). Caselaw interpreting the statute broadens this definition, holding that a prison official qualifies as an investigative or law enforcement officer such that calls intercepted directly by prison personnel, as in the Fairfax County facility, need not be judicially authorized pursuant to the law enforcement exception.

**9.** *See Hammond,* 286 F.3d at 192 (finding that the Bureau of Prisons was acting in the ordinary course of its duties by routinely monitoring inmate telephone calls); *United States v. Sababu,* 891 F.2d 1308, 1329 (7th Cir.1989) (stating that the "ordinary course" requirement was " 'clearly satisfied' where the recordings were authorized by prison regulations and were made in accordance with established prison routine."); *United States v. Green,* 842 F.Supp. 68 (W.D.N.Y.1994) (finding that recording was not within the ordinary course of duties of prison officials because it was intended to gather evidence in a criminal investigation of a single inmate).

*See Hammond,* 286 F.3d at 192 (applying the law enforcement exception in the prison context); *Sababu,* 891 F.2d at 1328 (same); *Feekes,* 879 F.2d at 1565 (same); *Paul,* 614 F.2d at 117 (same). Although circuit caselaw does not squarely address whether an entity acting as the agent of a prison pursuant to a government contract may qualify under § 2510(7) as an investigative or law enforcement officer,[10] another section of the statute provides that:

> an interception under this chapter may be conducted in whole or in part by Government personnel, *or by an individual operating under a contract with the Government,* acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

18 U.S.C. § 2518 (emphasis added); *see also United States v. Lopez,* 300 F.3d 46, 55 (1st Cir.2002) (interpreting § 2518 as permitting the government to rely on civilian monitors acting pursuant to contract and subject to government supervision). Title III's legislative history also confirms that monitoring and interception under the statute may be performed by government personnel or "by individuals operating under contract with the Government," provided, as occurred here, that those individuals are properly authorized and supervised. *See* S. REP. NO. 99–541, at 31, 1986 U.S.Code Cong. & Admin.News, p. 3555 (1986).[11]

■ It follows that Verizon's and Global Tel*link's recording of Rivera's calls pursuant to their contract with Arlington County comes within the law enforcement exception. Verizon and Global Tel*link

acted exclusively under the direction of Arlington County prison officials. In essence, Verizon's and Global Tel*link's role was limited to providing the means and equipment used to record the calls. They did not listen to or monitor the calls; nor did they have any discretion concerning which calls to record. All monitoring of Rivera's calls was conducted by prison officials. In these circumstances, the law enforcement exception fits well.

In sum, in the Fairfax County facility, Rivera's calls were recorded and monitored by prison officials and thus clearly fall within the law enforcement exception, 18 U.S.C. § 2510(5)(a)(ii). In the Arlington County facility, although all inmate calls were recorded by Verizon and Global Tel*link pursuant to a contract with the prison, Rivera's calls nonetheless fall within the law enforcement exception because Verizon and Global Tel*link recorded all inmate calls, including Rivera's, pursuant to Arlington County's contractual authorization and under the County's supervision.

## B. *Consent Exception*

■ The statute's prohibition against the interception of communications also does not apply when "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c); *see also United States v. Acklin,* 72 Fed.Appx. 26, 27, 2003 U.S.App. LEXIS 15437, at *2 (4th Cir. Aug. 1, 2003) (applying the consent exception to telephone calls by a prison inmate); *Hammond,* 286 F.3d at 192; *Lanoue,* 71 F.3d at 981; *Feekes,* 879 F.2d at 1565. Title III's

---

**10.** Although it did not explicitly address the issue, the First Circuit has implicitly approved the interception of inmate telephone calls by a private entity with whom the Department of Corrections contracted pursuant to the law enforcement exception. *See Gilday v. Dubois,* 124 F.3d 277, 282 n. 7 (1st Cir.1997).

**11.** The legislative history indicates that Congress desired to permit the government to contract out monitoring functions to private entities in order "to free field agents from the relatively routine activity of monitoring interceptions so that they can engage in other law enforcement activities." S. REP. NO. 99–541, at 31 (1986).

legislative history indicates that "consent may be express or implied in fact from 'surrounding circumstances indicating that the [defendant] knowingly agreed to the surveillance.'" *Van Poyck*, 77 F.3d at 292 (citing *Griggs–Ryan v. Smith*, 904 F.2d 112, 116–17 (1st Cir.1990)); *see also Horr*, 963 F.2d at 1126 (finding that the defendant implicitly consented to monitoring by using the telephone after receiving notice of monitoring); *Amen*, 831 F.2d at 378 (same). In the prison context, when the facility has notified an inmate that his telephone calls may be recorded and monitored, the inmate's subsequent use of the telephone implies the requisite statutory consent to the recording and monitoring. *See Hammond*, 286 F.3d at 192 (finding that the defendant consented to the interception of his conversations because he was notified of recording and nonetheless used the telephone); *Willoughby*, 860 F.2d at 19–20 (same); *Amen*, 831 F.2d at 379 (same).

■ Rivera plainly consented to the recording and monitoring of his telephone calls at both facilities because he used the telephone after receiving notice that his calls would be recorded and/or monitored.[12] Both facilities adequately alerted inmates, including Rivera, to the fact that calls would be monitored. In addition to this constructive notice, there is little doubt that Rivera in fact knew his calls were being monitored. This is reflected in the fact that he and the persons with whom he spoke took pains to use code or slang words to attempt to disguise the meaning of their conversations.[13] Also, on occasions when the subject under discussion was particularly sensitive, he often used the term *"charros-churros,"* a Spanish expression that translates most closely to "of this we should talk no further," presumably to frustrate the successful monitoring of his calls. Moreover, in at least one telephone call, Rivera and another gang member discuss their awareness and concern that their taped telephone conversations may incriminate them in another murder.

In sum, it is fair and reasonable to conclude that. Rivera consented to the monitoring of his telephone calls because it is clear that Rivera chose to proceed with the calls in the face of ample notice that they would be monitored. He wrongly assumed that his use of code and slang plus his use of another inmate's PIN would mask the meaning of his conversations and his identity.

Rivera argues, unpersuasively, that Arlington County's notice was insufficient to warrant implication of consent. In support of this contention, he cites a First Circuit case holding that "deficient notice will almost always defeat a claim of im-

---

**12.** *See Hammond*, 286 F.3d at 192 (finding implied consent from notice through two handbooks, a consent form, an orientation lecture, and posted signs); *Van Poyck*, 77 F.3d at 292 (finding implied consent from notice by posted signs, a consent form, and a prison manual); *Willoughby*, 860 F.2d at 20 (finding implied consent from notice by posted signs, a lecture, and a consent form); *Amen*, 831 F.2d at 379 (finding implied consent from notice in the Code of Federal Regulations, at a lecture, in an inmate handbook, in posted signs, and in a consent form).

**13.** *See United States v. Friedman*, 300 F.3d 111, 123 (2d Cir.2002) ("We note that Kenneth used cryptic language, evincing his understanding of the possibility that the calls would be monitored or taped."); *United States v. Workman*, 80 F.3d 688, 692–94 (2d Cir.1996) (inmate's use of coded language suggested consent). *But see Feekes*, 879 F.2d at 1565 (holding that the consent exception did not apply even though the defendant spoke in code in the recorded calls); *United States v. Cheely*, 814 F.Supp. 1430, 1444 (D.Alaska 1992) (stating that the defendant's use of code suggests his non-consent to the recording and monitoring of his calls).

plied consent." *Lanoue*, 71 F.3d at 981. The deficiency, he argues, is that Arlington County's notice did not make clear that Rivera's calls would be recorded by Verizon and Global Tel*link, rather than by the Arlington facility. The omission of this detail from the notice in no way renders the notice deficient in advising Rivera of the essential fact that his calls would be monitored. This fact was all he needed to know for the purposes of consent.[14]

Rivera also argues that even assuming the sufficiency of the notices, it would not be proper to conclude that Rivera implicitly consented because his use of the phones in the face of notices merely establishes his acquiescence to the recording and monitoring, not his consent. Although this proposition finds support in some cases,[15] that authority is unpersuasive. Rivera clearly knew on each occasion, prior to using the telephone, that his call could be recorded and monitored. If "he did not wish to submit to recording, [he] had the option not to use the phone." *Rohlsen*, 968 F.Supp. at 1054. It is not unreasonable, despite defendant's contention to the contrary,[16] for the facilities to compel Rivera to make that choice given that as a detainee and convicted felon, Rivera had no right to use the phone, and had only been granted a privilege to do so. *See Acklin*, 72 Fed.Appx. 26, 27, 2003 U.S.App.

LEXIS 15437 at *2 (finding consent when a prison imposed monitoring "as a condition to using the inmate phone system"); *Hammond*, 286 F.3d at 192 (finding consent when a prison required monitoring "as a condition of using prison telephones"). The urged distinction between acquiescence and consent would only be persuasive if, as is not the case here, Rivera had a right to unmonitored telephone calls.

Accordingly, for the reasons stated, the telephone calls the government seeks to admit at Rivera's trial come within both the law enforcement and consent exceptions to Title III and may not be suppressed.

An appropriate order has issued. *See United States v. Rivera et al.*, Criminal Action No. 02–376–A (E.D.Va. October 16, 2003) (Order).

---

14. None of the cases finding consent based on notice required that the prison notify the inmate regarding precisely what entity would be making the recording. *See Hammond*, 286 F.3d at 192; *Van Poyck*, 77 F.3d at 292; *Horr*, 963 F.2d at 1126; *Willoughby*, 860 F.2d at 20; *Amen*, 831 F.2d at 379.

15. *See United States v. Daniels*, 902 F.2d 1238, 1245 (7th Cir.1990) ("[K]nowledge and consent are not synonyms."); *Cheely*, 814 F.Supp. at 1443 ("I share the concern expressed by the Seventh Circuit in *United States v. Daniels*, that this reasoning turns acquiescence into consent."); *see also Feekes*, 879 F.2d at 1565 ("Although accepted in *United States v. Amen* on the basis of consid-

erable case authority and some legislative history, this argument is troubling. To take a risk is not the same thing as to consent."); *Crooker v. U.S. Department of Justice*, 497 F.Supp. 500, 503 (D.Conn.1980) ("[I]n the present case, knowledge of the monitoring . . . and the existence of a justifiable need for such monitoring are clearly not sufficient to establish consent.").

16. In his brief, Rivera argues that he did not consent by using the telephone after notice that his calls would be recorded because "if Rivera wanted to initiate direct communication with the outside world he had to use the phone." (Def.Br.6).